Sparks v. Hoffman, No. S0367-05 CnC  (Norton, J., Aug. 4, 2005)

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

STATE OF VERMONT                                       SUPERIOR COURT
Chittenden County, ss.:                            Docket No. S0367-05 CnC


SPARKS

v.

HOFFMAN


ENTRY

Petitioner and the Department of Corrections seeks summary judgment in their respective favors for a V.R.C.P. Rule 75 complaint. Petitioner argues that his conditional reentry was wrongly revoked and that he was saddled with an improper punishment. Corrections disagrees.

Petitioner is an inmate currently serving a sentence of 16 months to eight years for multiple convictions, including domestic assault, simple assault, theft, passing a bad check, and reckless endangerment.  In February

of this year, Corrections deemed Petitioner eligible for conditional reentry furlough.  This program is authorized by 28 V.S.A. § 808(a)(6) and is one of a number of furlough programs of various length and restrictions that inmates may be eligible for depending on their circumstances.  As part of this program, Corrections allowed Petitioner to leave his correctional facility on February 25 to meet his "community correctional officer," whose role was to monitor Petitioner's adherence to his conditional reentry conditions, his general behavior, and his progress at re-integrating with the community.  This meeting, known as an intake interview, would also mark the beginning of Petitioner's furlough.

This intake interview, which is a standard part of the conditional reentry program, may best be characterized as the final stage in the conditional reentry approval process.  Among other things, it was an opportunity for Corrections to review with Petitioner the 22 general conditions of his initial conditional-reentry agreement, which included condition C that required Petitioner "not [to] engage in threatening, violent or assaultive behavior." This was also the point where Petitioner would have been given his more specific conditions and where he would have been expected to sign his final agreement.

In most cases, this intake meeting appears to be more ceremony and formality than negotiation and formation.  Inmates are expected to come, meet their community correctional officers, review the conditions of their reentry, agree to any final conditions that Corrections has added, and go on their furloughed way.  Unfortunately when Petitioner arrived at his February 25 meeting, he saw an ex-girlfriend in the parking lot whom he threatened, assaulted, and acted toward in a violent manner.  Petitioner's community correctional officer, after consulting with a supervisor, suspended Petitioner's conditional reentry and sent Petitioner back to his

correctional facility.  Five days later, Petitioner had a hearing at which he admitted to violating the terms of his conditional reentry agreement.  The hearing officer subsequently revoked Petitioner's conditional reentry.

Under the relevant statute, Corrections may, at its discretion, put inmates into the conditional reentry program.  28 V.S.A. § 723.  This grant is permissive and gives Corrections the authority to determine who shall be eligible and to what conditions they will be subject.  28 V.S.A. § 808(a)(6).  Neither Petitioner nor Corrections dispute that Petitioner violated the terms of his conditional reentry.  Their initial dispute and the threshold question in Petitioner's unusual situation is whether he was formally on "conditional reentry," as defined in §§ 723 and 808(a)(6), when he acted against his ex-girlfriend.  By formulating the question this way, the court seeks to avoid the pitfall that Corrections has fallen into by defining Petitioner as simultaneously violating the terms of his conditional reentry while he was not technically in the program.

Petitioner argues that he was on conditional reentry from the moment he left the correctional facility, even if it was not exactly the same program that he would have been in if he had successfully completed the intake interview.  The facts of Petitioner's limited release on February 25 contradict this position.  On that day, Petitioner had a restricted "one-way" pass to go from the correctional facility to the offices of his future community corrections officer.  Petitioner was not, by the terms of this furlough, permitted to stop by a friend's house, grab a bite to eat, or any other innocuous activity that he would be able to enjoy after his intake meeting as part of his broader conditional reentry.

These limitations are particularly telling in determining Petitioner's status on February 25.  He was in a no-man's land between incarceration and furlough.  While Corrections and Petitioner can give this many

different names, both parties can agree that it was a limited status with more rights than an incarcerated inmate (ability to leave the facility) but less than a furloughed one. For the purposes of the present motion, the court views this status as indistinguishable from incarceration.

The simple problem with Petitioner's argument is that he had not passed through all of the prerequisites of conditional reentry. The intake meeting may or may not be the most important step that an inmate takes toward conditional reentry, but regardless of its ultimate function in the

process, it is still a necessary part. Whatever ceremonial function the intake meeting might serve elsewhere, it was an effective last review in this case, giving Corrections one final and important opportunity to evaluate Petitioner's fitness for the program. As Petitioner had not signed his final agreement, complied with all of the pre-requirements of the program, he was still an incarcerated inmate, albeit one with a foot out the prison gate.

In this respect, the court agrees with Corrections that Petitioner's situation is best understood as analogous to a parolee who has been approved for parole but had not signed his final parole agreement. Under 28 V.S.A. § 502c, parole may be withdrawn anytime before the final parole agreement has been signed; after that, Corrections must follow certain procedures to effectively suspend parole. Here Petitioner had not signed his final conditional reentry agreement. His actions just prior to doing so caused Corrections to withdraw his conditional reentry, and he was returned to the correctional facility.

Much of the confusion in this case stems from Correction's post-incident treatment of Petitioner and its explanation of revocation as being due to a violation of Condition C. While Petitioner was not officially in the

program, Corrections chose to give him due process consistent with what it understood to be the rights of an inmate on conditional reentry. Corrections appears to have taken this course of action less out of any recognition of Petitioner's status and more for the strategic desire to protect any decision from future Rule 75 challenges. As a withdrawal of conditional reentry, Corrections did not owe Petitioner any specific process in its revocation. The directives that Corrections has adopted, rightfully or wrongfully outside the Vermont Administrative Procedures Act, for dealing with inmates that violate the terms of their conditional release do not apply in this situation. As with § 502c, Corrections actions amount to a pre-agreement revocation of conditional reentry based on Petitioner's failure to abide by the terms of his future agreement while he was still incarcerated.

Notwithstanding the fact that the same violation after the intake meeting—perhaps in the parking lot directly afterwards—might have represented a different question of due process and liberty interest, Petitioner had no inherent right to conditional reentry prior to his final agreement. See Conway v. Cumming, 161 Vt. 113, 118–19 (1993) (an inmate has no constitutionally protected interest in furlough). Instead of looking to the procedure that Corrections followed and its validity under the VAPA, this review is limited to merely finding "some evidence" to support Correction's decision to withdraw its offer of conditional reentry. LaFaso v. Patrissi, 161 Vt. 41, 49–51 (1993).

The record shows that Corrections had an abundance of evidence to establish Petitioner's behavior, including Petitioner's own admission of guilt. While Petitioner's admission of guilt demonstrates a certain amount of self-awareness and perhaps burgeoning maturity, it does not lessen his offense or his guilt. Corrections chose to punish this infraction, and it is not the function of this court to question that discretionary action. In

challenging his due process, Petitioner's arguments are a bit disingenuous. Petitioner admits that he acted in a hostile, threatening, and violent manner toward an ex-girlfriend, within an hour of leaving prison. Whatever process Petitioner claims to lack in this situation is irrelevant; there is no doubt that he violated the expected standards of his incipient furlough. Any process potentially missing does not undercut this well established fact. Nor do any of Petitioner's arguments establish that he was hurt by any deficiencies in Correction's process. Petitioner's hearing was held soon after his return. He was able to present evidence, raise questions, and respond to the charges. Regardless of his status, Petitioner had the process he was due.

Finally, Petitioner's main concern is really about the loss of his furlough. Aside from the statutory right Corrections had in withdrawing his furlough, there are sound public policy reasons to uphold Correction's decision to punish Petitioner in this manner. Conditional release and other types of long-term furlough and parole programs are designed to help an inmate ease back into society after incarceration. They are attractive to society because they ease prison overpopulation and give inmates incentives to turn away from the anti-social behaviors that landed them in trouble in the first place. For inmates, they are coveted opportunities to leave prison and regain some freedoms. They also offer them the chance to reintegrate with society, adjust to freedom, and rebuild work and personal connections.

Given these benefits, it would only be logical that inmates would have the greatest incentive to be on their best behavior at the intake interview when furlough is a fresh possibility and prison is close at hand. Petitioner's failure to adhere to the strictures of his conditional reentry within an hour of his release from prison did not bode well for his future

success. When an inmate cannot adhere to the rules in Correction's facility, when he is mere moments away from conditional reentry furlough and greater freedom, then both he and society are best served by his return to prison where he may learn from his mistakes.

Based on the foregoing, Petitioner's motion for summary judgment is Denied. Department of Correction's motion for summary judgment is Granted. Case is Dismissed.

Dated at Burlington, Vermont_____, 2005.


_____
Richard W. Norton, Judge